UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIM. NO. 17-CR-10337 |
| LOGAN PROCELL | ) ) ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Logan Procell, submits this memorandum to assist the Court in determining an appropriate sentence in this case. The defendant requests this Court impose a sentence of 120 months incarceration. This sentence is sufficient but not greater than necessary to comply with the purposed enunciated by Congress in 18 U.S.C. § 3553(a).

## Logan Procell's Background

Logan Procell is 25 years old. He was born in Shreveport, Louisiana in 1993, and was raised by his mother, Kimberly Procell, and late father, Norman Procell, in their family home. He has seven siblings, and is the fourth child. Kimberly Procell's mother and father were fifteen years old, and forty-eight years old, respectively when they married.[1] Kimberly was the 25th of her father's 26 children.

---

[1] There is no minimum age in Louisiana to wed with parental consent, and Court authorization. A person may marry without parental consent at a minimum age of sixteen.

1

As a toddler, Logan required very clear and detailed instructions and was not able to "read between the lines" in verbal communication. As a young child, Logan was quickly identified by his teachers as gifted. In the first grade his teacher requested he be screened for the gifted program, which indicated Logan's IQ was 150 at seven years old. Frequently, his teacher asked Logan to tutor other students. Logan was always happy to tutor, and was an overall happy-go-lucky type child. Logan's introversion gradually intensified starting in the third grade, when he gained a significant amount of weight.

Logan was an energetic and loud child until his eighth birthday, when he became more reserved and began to keep to himself. Logan's eyesight was very poor, which while coupled with an insect phobia, made him prefer the indoors. Throughout his childhood, Logan had very few friends, and had difficulty interacting with other children, but would assist another child with schoolwork whenever asked. Logan often found it difficult to communicate with his parents.

Logan thrived in a predictable, structured environment and is very rule-bound.  He has always struggled with changes in his routine or environment, and struggles with transitions. Logan hates being hugged, or touched, and prefers to wear soft-textured clothing. Over time, Logan began to avoid in-person interactions, and became self-isolated.

In sixth-grade, Logan started noticing girls. Hyper-aware of his own awkwardness, he would nevertheless attempt age-appropriate flirtation, get made fun of, and then retreat further into himself. He describes himself as someone who always suffered an inner turmoil with social relationships. Every attempt he made at normalcy with his peers

2

failed, and he felt at a young age that he was destined to be alone, suffering immense pain and frustration as a result.

Logan became more socially withdrawn as he entered adolescence. His peers made fun of him calling him "weird." At the time, Logan felt a key component of his life was missing, and would regularly cry violently for hours. He became aware he was not capable of forming interpersonal relationships because he was unable to interact with other people. Around this time, Logan began viewing pornography and masturbating excessively as an escapist distraction, and as a replacement for interpersonal communication.

Logan was a straight-A student in middle and high school and won many awards for his contributions to activities. Logan found he enjoyed the structure and rigorous activities of the Junior ROTC, and achieved the rank of Major. In his teenaged years, Logan became more aware of his social limitations, and began to suspect that some of his responses were inappropriate; unfortunately, he never shared that feeling with anyone.

In 2010, Logan took an opportunity to attend a high school that would challenge him academically. Logan made a difficult decision to leave home, and move to a residential school – the Louisiana School for Math, Science, and the Arts ("LSMSA") in Natchitoches, Louisiana. LSMSA is an extremely competitive and selective public boarding school. This decision was made all the more difficult because Logan's father, Norman Procell, had chronic health issues.

Norman was never healthy and suffered from a chronic cough, diabetes, reflux, gout, and hypertension. From a young age, Logan was responsible for dispensing his

3

father's medicine twice daily. Logan struggled with having to face head-on his father's mortality, and had a mental health crisis at twelve, when Logan realized his father would die one day. From that point on, Logan tried to focus his childhood on not being a burden to his family. Logan describes his childhood as one where he would "go to school, come home, and try not to be a bother."

In 2010, around the time that Logan would leave home to attend LSMSA, Norman needed an open-heart surgery to replace a defective valve, and doctors discovered that he suffered from a bleeding disorder known as Von Willebrand's disease. This disease increases the impact of any surgery a person has, and Norman unfortunately had many surgeries from 2010 to 2015 (adrenal gland tumor removal, cholecystectomy, cyst removal, and a thyroidectomy).

Although his father's health remained a concern, Logan excelled academically in high school at the LSMSA, but participated in few extracurricular activities and had even fewer friends. Logan was socially isolated, and had the overwhelming sense that the few friendships he had were a result of the forced close proximity of a boarding school, although he now acknowledges it is possible they shared a kinship rooted in their unspoken, but shared severe social challenges.

Logan graduated from the LSMSA and subsequently attended Louisiana State University, majoring in Petroleum Engineering. At college, Logan was more alone than ever. He did not have any friends, and spent most of his time either in class or in his dorm room, by himself. Logan recalls going for weeks without speaking to another person.

However, these struggles were masked by his academic success and he graduated in 2016 with a 3.5 GPA.

Shortly after Logan's graduation from college, Norman's health took a turn for the worse. Logan moved back home to be with his family and to care for his father. In order to help financially contribute to the family, Logan took a job with his uncle's business, a small construction services company. Norman had a series of transient ischemic attacks, known more colloquially as mini-strokes. On February 17, 2017, Norman had one such stroke and lost complete control of his left side. Norman refused ambulance transport, so Logan and his brother, Collin, carried him to the family vehicle. At this time, Norman was 300 pounds and over 6 feet tall. It was hard for Logan to hold his father – a giant in his eyes – weakened, crippled, and crumpled in his arms.

Once in the car, Logan's mother Kimberly drove Norman to the hospital. Norman was released from the hospital but suffered another stroke a few days later and returned to the hospital. Norman continued to have strokes, and his condition deteriorated further, including partial paralysis of his entire left side. Norman would constantly beg for someone to put a bullet through his head to end the pain.

Eventually, Norman was moved to the ICU, where he had a final massive hemorrhagic stroke and never recovered. After some time, the family decided to forgo painful life-extending surgeries and terminated life support. Norman died shortly thereafter, surrounded by Logan and his family. Logan buried his college degree with Norman's ashes to pay tribute to his father's memory and as a final thank you for everything Norman did to ensure Logan's academic success.

After his father's death, Logan went back to work at his uncle's business, full-time, doing manual labor. He lived at home, and slept on the couch. Logan felt extremely guilty about the financial burden his schooling had (and has) placed on the family, so he worked as often as possible to help contribute to the debt. In the fall of 2017, a position at Kimberly's school opened up, and Logan applied. The primary reason Logan took a position as a teacher is that his student loan obligation could be forgiven.  Logan also wished to make enough money so his younger siblings could attend college. He was employed as a chemistry teacher at the time of his arrest.

The internet habits he developed in his youth, including using pornography as a distraction from his pain, never went away, and became progressively unhealthy. He spent hours on the internet. At first, he viewed normal pornography, but he felt there was a disconnect between what he was watching and what he was looking for – a  connection with a woman. He then turned to "cam girl" videos, where women live-stream themselves doing a variety of sexual poses, in various stages of undress.[2] Some of the operators of these live-streams will conduct conversations with their viewers and respond to requests, which made Logan feel like what he was doing was as close to a relationship as he would ever get. It is under these circumstances, through Periscope, a web site that allows for live-streaming, that Logan met the victim in this case.

---

[2] *See, e.g.* Amy Shields Dobson, *Femininities as Commodities: Cam Girl Culture*, *in* NEXT WAVE CULTURES: FEMINISM, SUBCULTURES, ACTIVISM, 123 (Anita Harris ed., 2012).

6

Logan met his girlfriend, Annelle, who lives in Oregon through Reddit, a message board style website, on a forum for "redditors" looking for relationships.[3] He deleted all his pornography and stopped spending all his time on the Internet. Logan was in an age-appropriate relationship for the first time, and he felt he might not end up alone after all.

Prior to his incarceration, Logan had never been fully screened for a mental disorder. He was diagnosed with ADHD in college and briefly treated for it. Dr. Gagan Joshi has met with Logan and spoken with his family for a psychiatric evaluation.[4] Dr. Joshi diagnosed Logan with Autism Spectrum Disorder, Mood Dysregulation, Anxiety Disorder, and ADHD.

Dr. Joshi found that Logan was "very intellectually expressive but struggled to express feelings. He was not very affectionate as a child and seldom expressed any emotional needs."[5] Logan was hypersensitive to certain sounds, preferred soft-textured clothing, was less sensitive to pain, and very reluctant to get his hair cut.[6] Logan is a virgin and "has never had any sexual contact with another person in his entire life."[7]

Leo Keating, LICSW, also evaluated Logan. He found Logan had healthy sexual interest in adult women only, and that he suffered from Major Depressive Disorder, which made him "depressive, fearful, socially anxious, self-pitying, and pessimistic."[8]

---

[3] R4R, *available at* https://www.reddit.com/r/r4r/.
[4] *See* Exhibit 1, Dr. Gagan Joshi's evaluation.
[5] *Id.*
[6] *See id.*
[7] *Id.*
[8] *See* Exhibit 2, Leo Keating Evaluation.

7

He has "persistent feelings of inadequacy . . . [and a] expectation of rejection."[9] Mr. Keating noted that Logan's "Autism Spectrum Disorder went undiagnosed because he is very intelligent. Both his school and his family failed to recognize that, although academically successful, he had serious social limitations." As a result, Mr. Keating concluded that in his professional opinion, Logan "represents an extremely low risk to engage in any form of sexual misconduct," does not pose a risk to the community, does not harbor deviant sexual interests and, is not a pedophile.[10]

*Autism and Sexual Misconduct*

Individuals like Logan, who have High Functioning Autism Spectrum Disorder ("ASD") have symptoms of:

- Persistent deficits in social communication and social interaction such as deficits in developing, maintaining, and understanding relationships and;

- Restricted, repetitive patterns of behavior, interests, or activities, as manifested by highly restricted, fixated interests that are abnormal in intensity or focus.[11]

Further, these traits lead to "significant impairment in social, occupational, or other important areas of functioning."[12] Sometimes these impairments can lead to criminal behavior, and studies have shown a connection between those, who like Logan, have a

---

[9] *Id.*
[10] *Id.*
[11] DSM-5 Diagnostic Criteria for Autism Spectrum Disorder, 299.0 F84.0 *available at* https://images.pearsonclinical.com/images/assets/basc-3/basc3resources/DSM5_DiagnosticCriteria_AutismSpectrumDisorder.pdf.
[12] *Id.*

8

deficit of interpersonal skills or an ability to respond to social constraints on their behavior, and criminal offending.[13]

In a study examining the "social and romantic functioning in adolescents and adults with ASD," researchers found that a statistically significant number of individuals with ASD "were more likely to engage in inappropriate courting behaviours and were more likely to focus their attention upon celebrities, strangers, colleagues, and ex-partners and to pursue their target longer than controls." [14]

Indeed, high-functioning ASD used to be known as "Asperger's Syndrome," after Hans Asperger, and his original case studies of young children showed signs of early sexual dysfunction such as masturbation in public and exhibitionism.[15] ASD is defined by "the social interaction and communication deficits and difficulties in seeing the perspective of others and intuitively understanding nonverbal social cues."[16] As a result, and as Logan experienced, "sexuality-related problems can arise, especially at the start of puberty, a time when the development of ASD individuals' social skills cannot keep up

---

[13] Barbara Haskins and J. Arturo Silva, *Asperger's Disorder and Criminal Behavior: Forensic-Psychiatric Considerations*, J. Am. Acad. Psych. and Law, 34 (2006).

[14] Mark Stokes, *Stalking, and Social and Romantic Functioning Among Adolescents and Adults with Autism Spectrum Disorder,* 37 J. AUTISM DEV. DISORD. 1969 (2007) *available at* https://link.springer.com/article/10.1007/s10803-006-0344-2

[15] *See,* Hans Asperger*, Die Autistischen Psychopathen im Kindesalter*, EUROPEAN ARCHIVES OF PSYCH. AND CLIN. NEUROSCIENCE (1944), *available at* https://link.springer.com/article/10.1007%2FBF01837709.

[16] Daniel Schoettle, *Sexuality in Autism: Hypersexual and Paraphilic Behavior in Women and Men with High-Functioning Autism Spectrum Disorder*, 19 DIALOGUES CLIN. NEUROSCI 381 (2017).

with increasing social demands, and the challenges of forming romantic and sexual relationships become particularly apparent."[17]

Studies of males with ASD found that this group is more likely to engage in solitary sexual activities, while at the same time, harboring a greater desire for sexual and romantic relationships.[18] Sexual education, already at a poor state in this country, is even worse for individuals with ASD and this group does "not receive sexual education that takes their behavioral peculiarities into consideration, and they are less likely to get information on sexuality from social sources."[19] Some studies, mainly focused on male subjects, have found that ASD individuals show excessive masturbation, exhibitionistic behaviors, fetishistic fantasies or behaviors, or other forms of paraphilias.[20]

## An Appropriate Sentence

The Defendant is charged with one count of Coercion & Enticement of a Minor, under 18 U.S.C. § 2422(b). This crime carries a mandatory minimum of 120 months. Pursuant to USSG § 2G1.3(a)(3), the base offense level is 28. Count 2 is for Transferring Obscene Matter to a Minor under 18 U.S.C. § 1470, and carries no mandatory minimum with a maximum of 10 years. There are potential enhancements on Count 1: a two-level enhancement for use of a computer; a two-level enhancement for unduly influencing a minor to engage in prohibited sexual conduct; and an eight-level enhancement for a victim minor under the age of 12. The resulting offense level would be 40, with a 3- level

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

reduction for prompt acceptance of responsibility which results in a Total Offense Level ("TOL") of 378. With a TOL of 37 and a criminal history category of I, due to a heretofore spotless criminal record, the defendant's guideline sentencing range is 210 to 262 months, or 17.5 years to 21 years. This extreme sentence would put a young man in his twenties and first-offender, in federal prison until his fifties. Logan understands that, post-incarceration, he will be required to register as a sex offender, and that failure to do so could subject him to new criminal charges pursuant to 18 U.S.C. § 2250.

Given the impact that Logan's previously undiagnosed Autism Spectrum Disorder has on his criminal conduct, the defendant requests that this Court adopt his sentencing recommendation of 120 months and 60 months of supervised release. Although this is below the guideline range, it is consistent with other below-guideline sentences for similar or worse conduct issued by courts in this district, discussed *infra*, and is a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553 (a)(2). The defendant's recommendation reflects the mandatory minimum for the coercion and enticement charge he pled guilty to.

As the court appreciates, the advisory guideline sentencing range is the "starting point and the initial benchmark" but it is not the only consideration in the sentencing analysis. *Gall v. United States*, 552 U.S. 38, 49 (2007). There is no presumption that a guideline range is reasonable. *Id.* at 50. The Court must ultimately "make an individualized assessment based on the facts presented." *Id.* The Court conducts a case-by-case analysis, "the hallmark of which is flexibility." *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). The overarching goal is to "consider every convicted person as an

11

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* quoting *Gall*, 552 U.S. at 52.

Logan completely understands why what he did was wrong, and he is ashamed to let down his mother and his father's memory in such an extreme manner. He feels he has thrown away everything his family has given him, and he will spend the rest of his life striving to be the man they worked so hard for him to be. He understands that he must be held accountable for all of his conduct, for the harm he inflicted on an eleven year old girl, but at the same time seeks proportionate punishment which takes into account the medical mitigating factors present in his case. The defendant humbly submits that considering his conduct in light of his undiagnosed condition merits the mandatory minimum of 10 years incarceration.

### The Nature and Circumstances of the Offense

This case is unlike that of other defendants in the federal system. This is because, tragically, Logan has been struggling with an undiagnosed developmental disorder for his entire life. Masked by his extreme intelligence, his ASD-caused social deficits led to Logan retreating further into himself, leading a lonely lifestyle of frequent masturbation and inappropriate pornography habits.

The myriad ASD studies discussed *supra* make clear that there is a connection between ASD and inappropriate sexual behavior. It is not uncommon for individuals like Logan to engage in excessive masturbation, and a lack of social connection, sexual education, or treatment made it so that Logan could not address these behaviors.

12

Unfortunately, as a result, Minor A was victimized and harmed, and accordingly, the defendant will be punished.

The criminal behavior at issue occurred when Logan was at the height of his depression and retreat into unhealthy sexual habits. His father died a painful death in front of his eyes and Logan had no friendships or relationships outside of his immediate family. It is under these circumstances that he started viewing pornography more regularly, and sought out cam girls on applications like Periscope, with whom he could interact sexually, although virtually. This is where he met Minor A, and in full awareness of her age, sought an illegal sexual relationship, hoping one day he could travel to Massachusetts, or even marry her when she was old enough. Prior to this charge, Logan had never travelled anywhere besides Louisiana or neighboring Texas, indicating these plans were more fantasy than reality. A 120-month sentence punishes Logan adequately for the conduct he engaged in, while acknowledging the role that his uncontrolled and unknown condition played here.

**Collateral Consequences**

In determining a sentence, the minimum mandatory is further warranted in this case, due to the profound effect that the collateral consequences of this case have had, and will continue to have, on this defendant. Judge Frederick Block of the Eastern District of New York has stated:

> I am writing this opinion because from my research and experience over two decades as a district judge, sufficient attention has not been paid at sentencing by me and lawyers – both prosecutors and defense counsel – as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant.

13

*United States v. Nesbeth,* 188 F.Supp.3d 179 (E.D.N.Y. 2016). Judge Block further noted that "there is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences." *Id.* at 180. "[T]he effects of these collateral consequences can be devastating." *Id.* As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g. United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (overruling prior holding that it was inappropriate for the district court to consider the lasting effects of sex offender registration in sentencing); *United States v. Pauley¸* 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming a district court's lower sentence because the defendant lost his teaching job and pension as a result of his conduct).

It is well-established that the collateral consequences of child pornography convictions are extreme. What follows defendants who commit this class of crime is nothing short of a lifetime of shame and humiliation. Logan will have to register as a sex offender, he will lose his teaching job (*see Pauley*), and he will have a hard time finding housing and employment. This is especially punitive for someone as young as Logan, whose adult life had just barely begun at this time of this offense. Further, this conviction will follow him the rest of his life, regardless of whether he successfully treats his Autism Spectrum Disorder underlying this offense. For a young man now only 25 years old, this

conviction carries a lifetime of shame and punishment, regardless of the length of incarceration set.

## The Need to Avoid Unwarranted Sentencing Disparities

The defendant's conduct is similar to other cases in this district where sentences below the guideline range have been imposed for defendants convicted of enticing a minor, sometimes with a longer criminal history and other important differences than the case at bar. In a review of 12 cases charging coercion or attempted coercion in this District, 10 of the 12 were below the guidelines, and two of the others were at the low end of the guidelines, at the minimum mandatory of 120 months. Two of these cases carried a guideline range of a life sentence, and one was sentenced below the 210 months the government seeks here. *See United States v. Peeler*, 16-40035 (138-month sentence involving exploited children from the Philippines), and *United States v. Debrum*, 15-10292 (216-month sentence for a fifteen count indictment with multiple victims, use of nude photos in order to extort and exert control).

In *United States v. Reid*, 12-10125-MLW, Judge Wolff sentenced the defendant to 180 months, when the guideline range was 235 months to 293 months, for behavior similar to Logan's, texting an underage girl and asking her for nude photos. Notably, the defendant had a long list of prior offenses, with 9 points being added for his criminal history, including a sexual assault on his half-sister. The Government's sentencing memo noted that the "defendant's arrest and subsequent convictions demonstrate an increasingly deranged and sexually obsessed character," unlike Logan who has no such history. (Doc. 41). This sentence was far below the guidelines in that case, which were 235-293 months.

15

The minimum mandatory of 120 months was deemed the appropriate sentence in *United States v. Stoloff*, 1:13-CR-10310-FDS, where the defendant sought out an eighth grader, actually met with her in person, and engaged in sexual intercourse. Stoloff was prevented from engaging in sexual intercourse a second time because he was arrested. The victim unsuccessfully attempted suicide shortly thereafter. The defendant had a Master's Degree in journalism from Columbia and according to the Government, "used his intellect to prey upon the vulnerabilities" of the minor victim. Where there was no physical contact or proximity between Logan and Minor A, the minimum mandatory should be imposed to avoid a disparity between Logan's crime and the more severe crimes of Stoloff.

## Conclusion

A sentence of 120 months incarceration is an appropriate punishment for Logan Procell. It holds him responsible for the crimes he committed, while taking into account his lack of prior criminal record, his underlying condition, the sentences imposed in similar and more serious cases, and the fact that professionals find him to have a low risk of reoffending. For these reasons, the defendant urges the Court to impose the mandatory minimum sentence. He requests placement by the Bureau of Prisons near his girlfriend at FCI-Sheridan or near his family at FCI-Oakdale.

LOGAN PROCELL<br>
By His Attorneys<br>
CARNEY & ASSOCIATES

*/s/ J. W. Carney, Jr.*
J. W. Carney, Jr.
B.B.O. # 074760

*/s/ Reyna Ramirez*
Reyna Ramirez
B.B.O. # 698630

Carney & Associates
20 Park Plaza, Suite 1405
Boston, MA 02116
617-933-0350
JCarney@CARNEYdefense.com

June 17, 2019

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or before the above date.

*/s/ J. W. Carney, Jr.*
J. W. Carney, Jr.

17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIM. NO. 17-CR-10337 |
| LOGAN PROCELL | ) ) ) | |

**AFFIDAVIT SUPPORTING**
**DEFENDANT'S ASSENTED-TO MOTION TO CONTINUE SENTENCING**

I, J. W. Carney, Jr., state that the facts contained in the attached motion are true to the best of my information and belief.

Signed under the penalties of perjury.

*J. W. Carney, Jr.*

J. W. Carney, Jr.

Dated: June 17, 2019